## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **KARI ELLEDGE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:19-cv-00176-MHH** |
| | } | |
| **ANDREW SAUL, Commissioner of the Social Security Administration,** | } } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Kari Elledge seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Elledge's claims for disability insurance benefits and supplemental security income. After careful review, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

Ms. Elledge applied for disability insurance benefits and supplemental security income. (Doc. 6-4, pp. 54, 55). Ms. Elledge alleges that her disability began on December 2, 2017. (Doc. 6-4, pp. 54, 55). The Commissioner initially denied Ms. Elledge's claims. (Doc. 6-4, pp. 54, 55). Ms. Elledge requested a hearing before an Administrative Law Judge (ALJ). (Doc. 6-5, p. 16). The ALJ issued an

unfavorable decision.  (Doc. 6-3, pp. 24-38).  The Appeals Council declined Ms. Elledge's request for review, making the Commissioner's decision final for this Court's judicial review.  (Doc. 6-3, p. 2).  *See* 42 U.S.C. §§ 405(g) and 1383(c).

## II.  STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and her 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r, Soc. Sec. Admin.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r, Soc. Sec. Admin.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r, Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if evidence preponderates against the Commissioner's findings."  *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III. SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven disability, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Elledge meets the insured status requirements through December 31, 2022. (Doc. 6-3, p. 12). Ms. Elledge has not engaged in substantial gainful activity since December 2, 2017, the alleged onset date. (Doc. 6-3, p. 12). The ALJ determined that Ms. Elledge suffers from the severe impairment of degenerative disc disease and the non-severe impairments of anxiety and depression. (Doc. 6-3, pp. 12, 13). Based on her review of the medical evidence,

the ALJ found that Ms. Elledge does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 14).

The ALJ determined that Ms. Elledge has the residual functional capacity to perform light work. (Doc. 6-3, p. 14). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). The ALJ found that Ms. Elledge is able:

> to lift/carry 20 pounds occasionally and 10 pounds frequently; she can sit, stand and walk for 6 hours total each; she can never climb ladders/ropes/scaffolds and can occasionally perform all other postural activities. The claimant must avoid all exposure to workplace hazards such as unprotected heights and dangerous machinery.

(Doc. 6-3, p. 14). The ALJ concluded that Ms. Elledge is able to perform her past relevant work as a floral designer and deliverer. (Doc. 6-3, p. 17).

Relying on testimony from a vocational expert, the ALJ found that other jobs existed in the national economy that Ms. Elledge could perform, including photocopy operator, product marker, and assembler. (Doc. 6-3, p. 18). Accordingly, the ALJ denied Ms. Elledge's disability claims. (Doc. 6-3, pp. 18-19).

## IV. ANALYSIS

Ms. Elledge argues that the ALJ erred in denying her claims because the ALJ misapplied the Eleventh Circuit pain standard; the ALJ did not give appropriate

4

weight to the opinion of Ms. Elledge's treating physician, Dr. Walker; and the ALJ did not base her RFC determination on substantial evidence. (Doc. 8, pp. 2-3). Because substantial evidence supports the ALJ's analysis of Ms. Elledge's pain testimony, Dr. Walker's opinion, and Ms. Elledge's RFC, the Court affirms the Commissioner's decision.

A.     Pain Standard

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, No. 18-11954, 2019 WL 1975989, at *3 (11th Cir. May 3, 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, No. 18-11708, 2019 WL 1758438, at *2 (11th Cir. Apr. 18, 2019) (citing *Wilson*). If the ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson,* 284 F.3d at 1225; *Coley*, 2019 WL 1975989, at *3. As a matter of law, the Secretary must accept the claimant's testimony if the ALJ inadequately or improperly discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*); *see Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987) ("It is established in this circuit if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true.").

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including

the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. An ALJ must explain the basis for findings relating to a claimant's description of symptoms:

[I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10. In evaluating a claimant's reported symptoms, an ALJ must consider:

(i) [the claimant's] daily activities; (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms; (v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms; (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r, Soc. Sec. Admin.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

Here, the ALJ found that Ms. Elledge's medical records and daily activities do not support her testimony regarding her pain and limitations. (Doc. 6-3, pp. 16-17). Accordingly, the Court first examines Ms. Elledge's testimony and then compares her testimony to the medical evidence in the record and to the evidence relating to her daily activities.

*Ms. Elledge's Testimony*

Ms. Elledge was 53 years old on her alleged onset date in December 2017. (Doc. 6-3, p. 17; Doc. 6-3, p. 40). Ms. Elledge has worked as a floral deliverer, a warehouse clerk, and a floral designer. (Doc. 6-3, pp. 36-39). Ms. Elledge testified that she had planned to buy the floral business from the owner for whom she was working in November 2017, but that the plan "all fell apart" because of her degenerative disc disease symptoms. (Doc. 6-3, pp. 35-36, 39).

According to Ms. Elledge, she cannot work because her back does not support her "for any duration of time." (Doc. 6-3, p. 43). Ms. Elledge described her symptoms during the September 2018 administrative hearing:

> My lower back, it fe[els] like my pelvis [i]s stuck forward and then I ha[ve] all kind of pains going down into my legs. My feet hurt. In my upper back something [has] popped. That [has gone] nuts. And then my upper back [has] started hurting a lot and into my neck. I ha[ve] had a headache every day. Honestly, it [has been] a progression. It just seem[s] like everything just [has] [fallen] in line over the nine-month period. It's always different.

(Doc. 6-3, pp. 29, 43).

Ms. Elledge testified that no doctor has recommended back surgery. (Doc. 6-3, p. 44). Ms. Elledge reported that she takes tramadol (one 50 mg tablet twice daily) to manage pain, but she stated that the medication does not enough help. (Doc. 6-3, pp. 44, 47).[1] Ms. Elledge denied experiencing side effects. (Doc. 6-3, p. 44). Later, Ms. Elledge testified that she falls asleep during the day, but she was uncertain whether tramadol caused sleepiness. (Doc. 6-3, p. 47).

Ms. Elledge is single and lives with her teenage son. (Doc. 6-3, p. 40). Ms. Elledge testified that she can drive, clean clothes with breaks, prepare meals, and shop. (Doc. 6-3, pp. 41, 45-46). Ms. Elledge stated that her pastimes include watching television, reading, and doodling. (Doc. 6-3, p. 42).

Ms. Elledge testified that her ability to shop decreased after she completed her functional report in late December 2017—Ms. Elledge shops three times monthly rather than multiple times weekly. (Doc. 6-7, p. 39; Doc. Doc. 6-3, p. 46). Accordingly to Ms. Elledge, she stopped attending church after Easter 2018 because the standing and kneeling periods were "too uncomfortable" for her lower back.

---

[1] Tramadol "is a narcotic-like pain reliever. . . . used to treat moderate to severe pain in adults." https://www.drugs.com/tramadol.html (last visited Dec. 31, 2019). The Court does not see a prescription for tramadol in Ms. Elledge's medical records. The administrative hearing was held on September 6, 2018. (Doc. 6-3, p. 29). Ms. Elledge's record from her August 1, 2018 visit to Tennessee Valley Pain Consultants does not mention tramadol in her list of prescription medication. (Doc. 6-10, p. 24). As discussed below, multiple doctors refused Ms. Elledge's requests for narcotic pain relievers.

(Doc. 6-3, pp. 41, 42).  Ms. Elledge did not testify about other post-report changes in her daily functioning.  (Doc. 6-3, p. 46).

*Medical Records*

1. Medical History

Ms. Elledge visited Dr. Walker, a primary care physician, in November 2017. (Doc. 6-9, p. 20).  She sought treatment for back pain.  (Doc. 6-9, p. 20).  Ms. Elledge reported to Dr. Walker that she was in a car accident several years earlier and that her work involved a lot of standing and leaning.  (Doc. 6-9, p. 20).  Ms. Elledge stated that her pain improved with shifting and was "not too bad sitting[.]"  (Doc. 6-9, p. 20).  According to Ms. Elledge, when she lied down at night, it took "a while [for her] to get comfortable[.]"  (Doc. 6-9, p. 20).

After examining Ms. Elledge, Dr. Walker detected no scoliosis, "no pain elicited [from palpation]; no palpable muscle spasm; no crepitus; [and] no masses." (Doc. 6-9, p. 20).[2]  Dr. Walker observed that Ms. Elledge has a normal lordotic curve and gait.  (Doc. 6-9, p. 20).  Dr. Walker reported that Ms. Elledge has a "limited

---

[2] Crepitus "describes any grinding, creaking, cracking, grating, crunching, or popping that occurs when moving a joint."  https://www.arthritis-health.com/types/general/what-crepitus (last visited Jan. 9, 2020).

active [range of motion] with flexion." (Doc. 6-9, p. 20). Dr. Walker performed a straight leg test; the results were negative. (Doc. 6-9, p. 20).[3]

Dr. Walker diagnosed Ms. Elledge with low back pain, mild depression, and anxiety. (Doc. 6-9, p. 20). Dr. Walker noted that Ms. Elledge was under "a bit of extra stress [due to her] job closing" and her need to search for new employment. (Doc. 6-9, p. 20).

Dr. Walker prescribed meloxicam (one to two 7.5 mg tablets daily for pain), and Robaxin (one 500 mg tablet nightly for muscle spasms and pain). (Doc. 6-9, p. 18).[4] Dr. Walker ordered an x-ray and MRI of Ms. Elledge's back. (Doc. 6-9, pp. 21, 22, 24). Dr. Walker provided Ms. Elledge with an acute low back pain handout. (Doc. 6-9, p. 21).

The mid-November 2017 x-ray results revealed:

FINDINGS: There is good alignment to the lumber spine. No compressed vertebra. No subluxation. There is disc space narrowing with small bone spurs at L5-S1.

---

[3] Examiners use the straight leg raise test to evaluate patients "with low back pain and nerve pain that radiates down the leg." https://www.ebmconsult.com/articles/straight-leg-raising-test (last visited Aug. 9, 2019).

[4] Meloxicam is a nonsteroidal anti-inflammatory drug "used to treat arthritis . . . [and] reduce[] pain, swelling, and stiffness of the joints." https://www.webmd.com/drugs/2/drug-911/meloxicam-oral/details (last visited Jan. 9, 2020).

Robaxin or methocarbamol is "a central nervous system (CNS) depressant and muscle relaxant used to treat muscle spasms, tension, and pain." It is not a narcotic but may be mistaken for one "due to side effects like drowsiness and dizziness, which can feel like a drug 'high.'" https://www.healthline.com/health/is-methocarbamol-a-narcotic (last visited Jan. 9, 2020).

IMPRESSION:

Degenerative changes at L5-S1.

(Doc. 6-9, pp. 2, 22, 28).[5]  Dr. Walker's assistant wrote on the x-ray results "arthritis changes with some narrowing of space. Dr. Walker/aw[.]"  (Doc. 6-9, p. 2).

The late November 2017 MRI results showed:

mild reversal of the upper lumbar curvature. There is a mild I retrolisthesis of L5 on S1 most likely chronic and degenerative with degenerative disc disease at this level. The remainder of the alignment appears within the normal range.

There is disc desiccation present particularly at L2-3, L4-5, and L5-S1 and moderate disc space narrowing at L4-S1. The vertebral body heights appear relatively intact allowing for minimal chronic anterior wedging of L1 and L2. No acute or active compression fractures are identified. There are scattered chronic Schmorl's nodes also seen at multiple lower thoracic and upper lumbar levels.

T12-L1:  The disc appears relatively intact at this level allowing for a small chronic Schmorl's node. No significant posterior bulging disc or any posterior disc herniation is identified. No neural foraminal encroachment or spinal stenosis is seen.

L1-2:  There is minimal diffuse posterior bulging of the disc at this level. This does not cause any significant neural foraminal encroachment or spinal stenosis. There are small Schmorl's nodes also seen  at this level.

L2-3:  There is minimal diffuse posterior bulging of the disc at this level. This does not cause any significant neural foraminal encroachment or spinal stenosis. There is a benign Schmorl's node also seen at this level.

_____

[5] Subluxation is the "[p]artial dislocation of a joint. A complete dislocation is a luxation." https://www.medicinenet.com/script/main/art.asp?articlekey=5581 (last visited Dec. 31, 2019).

L4-5:  There is mild to slightly more moderate diffuse posterior bulging of the disc at this level. This does cause minimal to mild bilateral neural foraminal encroachment. No significant spinal stenosis is seen.

L5-S1:  There is a smaller herniated disc present with a mild broad based posterior disc protrusion at this level associated with a disc osteophyte complex. This does cause mild to slightly more moderate bilateral neural foraminal encroachment. No significant spinal stenosis is seen[.]

The lumber cord or conus appears within the normal range.

IMPRESSION:

1. Slight grade I retrolisthesis of L5 on S1 most likely chronic and degenerative. Mild reversal of the normal lumbar curvature centered at the L1-2 level.

2. Minimal to mild multilevel degenerative disc disease from L1-2 through L5-S1 with a smaller herniated disc present at L5-S1 with a mild broad based posterior disc protrusion at this level associated with a disc osteophyte complex. Mild diffuse posterior bulging of the L4-5 disc, minimal to mild bilateral foraminal bulging of the L3-4 disc, and minimal diffuse posterior bulging of the L1-2 and L2-3 discs. Mild to slightly more moderate bilateral neural foraminal encroachment at L5 on S1 due to the herniated disc at this level.

3. No significant spinal stenosis seen.

(Doc. 6-9, pp. 24-25) (emphasis omitted).[6]

---

[6] Retrolisthesis is the "backward slippage of a vertebra . . . . [which] occurs when a single vertebra slips and moves back along the intervertebral disc underneath or above it. It's not the same as a dislocation."  https://www.healthline.com/health/retrolisthesis (last visited Dec. 31, 2019).

In early December 2017, Ms. Elledge received emergency treatment from the Decatur Morgan Hospital. (Doc. 6-9, p. 3). Ms. Elledge reported lower back pain from degenerative disc disease. (Doc. 6-9, p. 3). Dr. Wang, the emergency physician, examined Ms. Elledge and described her as "well, alert, [and in] no apparent distress[.]" (Doc. 6-9, p. 4). Dr. Wang noted tenderness in Ms. Elledge's lower back. (Doc. 6-9, p. 5). With respect to Ms. Elledge's extremities, Dr. Wang observed a normal range of motion, no tenderness, and a normal gait. (Doc. 6-9, p. 5). Dr. Wang diagnosed Ms. Elledge with "moderate degenerative changes of the spine [without] acute or suspicious bony lesion[s]." (Doc. 6-9, p. 7). Ms. Elledge received a prescription for cyclobenzaprine (one 5 mg tablet nightly) for muscle spasms. (Doc. 6-9, p. 7).[7]

Later in December 2017, Ms. Elledge visited the Cullman Spine Institute for an evaluation. (Doc. 6-9, pp. 13, 15). Ms. Elledge complained of "back pain and tingling to [her] bilateral lower extremities." (Doc. 6-9, p. 12). Ms. Elledge reported having mild to moderate back pain since 2012 "with it increasing greatly over the past 4 weeks" unrelated to an accident or injury. (Doc. 6-9, p. 12). Ms. Elledge described feeling the increased pain in her lower back and right extremity initially but noted shifting of the pain "to [the] middle and low back . . . and numbness to her

---

[7] Cyclobenzaprine "is a muscle relaxant. . . . [that] works by blocking nerve impulses (or pain sensations) that are sent to [the] brain." https://www.drugs.com/drug_interactions.html (last visited Jan. 21, 2020).

feet" since onset.  (Doc. 6-9, p. 12).  Ms. Elledge rated her pain five out of ten "on average" but reported that her pain did get "so severe" that it caused nausea.  (Doc. 6-9, p. 12).

Ms. Elledge told the certified registered nurse practitioner (CRNP) who examined her that Dr. Walker had prescribed muscle relaxer and anti-inflammatory medication to alleviate pain.  (Doc. 6-9, p. 12).  According to Ms. Elledge, lying down provided some pain relief.  (Doc. 6-9, p. 12).

The CRNP examined Ms. Elledge and reported that Ms. Elledge "stands with a normal posture" and "has a normal gait" with good toe and heel walk.  (Doc. 6-9, p. 12).  The CRNP noticed "mild tenderness about the lumbar spine" but "no obvious deformity," "palpable spasm," or "tightness."  (Doc. 6-9, p. 12).  The CRNP observed that Ms. Elledge had a limited range of motion from her fingertips to her knees.  (Doc. 6-9, p. 12).  The CRNP rated Ms. Elledge's "strength throughout all muscles of both lower extremities" five out of five.  (Doc. 6-9, p. 12).

The CNRP reported normal sensory testing results for Ms. Elledge "with the exception of subjective decreased sensation to [the] right lower extremity in multiple nerve distributions."  (Doc. 6-9, pp. 12-13).  Ms. Elledge's straight leg tests results were negative.  (Doc. 6-9, p. 13).

After reviewing the x-ray results, the CRNP diagnosed Ms. Elledge with "severe DDD (degenerative disc disease) L5-S1 with retrolisthesis of L5 on S1."

(Doc. 6-9, p. 13). The CRNP described the MRI results as revealing "mild disc desiccation L4-5 with broad-based central disc protrusion[;] [m]ild subarticular stenosis L4-5 bilaterally[; and] [s]evere DDD L5-S1 with retrolisthesis and Modic changes." (Doc. 6-9, p. 13). As reported in a January 2016 article posted on the American Chiropractic Association's website:

> Modic changes represent MRI observations of vertebral marrow and endplate changes. These changes have been linked to trauma, disc disruption and degeneration. . . . Degenerative disc disease (DDD) without Modic changes is a relatively insidious and not particularly painful condition, whereas DDD with Modic changes is much more frequently associated with pain. Type 1 Modic changes show bony edema and inflammation and are strongly associated with back pain. Emerging evidence indicates there is a progressive nature to Modic changes. The bony edema of type I Modic changes may progress to type 2, and type 2 may progress to type 3.

https://www.acatoday.org/News-Publications/ACA-News-Archive/ArtMID/5721/ArticleID/75/Bone-Morphology-and-Modic-Classifications

(last visited Dec. 31, 2019).

The CRNP provided the following assessment and plan:

> [Ms. Elledge] will likely require [a posterior lumbar interbody fusion] in the future. She was provided with a copy of "Treat Your Own Back" by Robin McKenzie as a source for regular back conditioning exercises. I encouraged walking regularly for cardiovascular exercise. We discussed that she may benefit from [a lumbar epidural steroid injection]. She is a private pay patient, and I discussed that [Cullman Regional Medical Center] could help her make payment arrangements if she wishes to pursue [a steroid injection]. She requested narcotic medication. I explained that our office does not prescribe[] for long-term pain management. She was recently evaluated by Dr. Walker. He [has] prescribed Relafen and Robaxin. I offered to refill the anti-

inflammatory and muscle relaxer. She states that she has only seen Dr. Walker once and has been released to our care. She was under the impression that we would be prescribing long-term pain management for her. She was very frustrated that she did not receive narcotic pain medication. I would like to review her MRI with Dr. Ward. [Ms. Elledge] will be contacted with additional plan of care after review of imaging studies.

(Doc. 6-9, pp. 13-14). Ms. Elledge received refills for Relafen (one 500 mg tablet twice daily) for pain and Robaxin (one 750 mg tablet every eight hours) for muscle spasms. (Doc. 6-9, p. 15).[8]

The CRNP added a note after conferring with Dr. Ward about Ms. Elledge's December visit:

Case and imaging studies were reviewed with Dr. [W]ard. Imaging findings are listed above. Dr. Ward agrees with current plan of care. [Ms. Elledge] may pursue [a steroid injection] at L4-5 if she wishes. She may discuss payment arrangements for [a steroid injection] with patient financial at [Cullman Regional Medical Center]. She will follow up with our office on an as-needed basis.

(Doc. 6-9, p. 14). A nurse left a message for Ms. Elledge about Dr. Ward's approval of the care plan. (Doc. 6-9, p. 16). Ms. Elledge called back and reported that "[s]he was unhappy with her office visit[.]" (Doc. 6-9, p. 16). Ms. Elledge believed that Dr. Ward would be evaluating her and that the visit would be more informative. (Doc. 6-9, p. 16). Ms. Elledge stated that she "would pick up her information" and

---

[8] Relafen "is a nonsteroidal anti-inflammatory drug (NSAID). . . . [prescribed to treat] inflammation and pain in the body." https://www.drugs.com/mtm/nabumetone.html (last visited Jan. 21, 2020).

visit another provider. (Doc. 6-9, p. 16). Ms. Elledge's medical records do not indicate that she requested a steroid injection.

Ms. Elledge visited Dr. Walker in late December 2017. (Doc. 6-9, p. 18). Ms. Elledge complained of back and between-the-shoulder blades pain. (Doc. 6-9, p. 18). Dr. Walker examined Ms. Elledge and noted that she showed "no apparent distress[.]" (Doc. 6-9, p. 18). Dr. Walker detected mild tenderness in Ms. Elledge's spine but found "no scoliosis or other abnormal curvatures[.]" (Doc. 6-9, p. 19). Dr. Walker reported a prominent right sternoclavicular joint and a prominent left metacarpophalangeal joint and diagnosed Ms. Elledge with segmental dysfunction of the sternoclavicular region. (Doc. 6-9, p. 19). Dr. Walker ordered x-rays of Ms. Elledge's sternoclavicular joints. (Doc. 6-9, p. 19). According to the December 2017 treatment record, Ms. Elledge's prescriptions included paroxetine (for depression), meloxicam (one to two 7.5 mg tablets daily for pain), and Robaxin (one 500 mg tablet nightly for muscle spasms and pain). (Doc. 6-9, p. 18).

Ms. Elledge had an MRI in January 2018. (Doc. 6-9, p. 33).[9] According to Dr. Jokich's findings, Ms. Elledge's spine alignment is "within the normal range" and her spine shows "[n]o significant spondylolistheses[.]" (Doc. 6-9, p. 33). Dr. Jokich provided the following impressions:

> 1. Minimal to mild two level degenerative disc disease at C4-5 and C5-6 with mild diffuse posterior bulging of a

---

[9] Dr. Carter referred Ms. Elledge to Dr. Jokich for the January 2018 MRI. (Doc. 6-9, p. 34).

disc osteophyte complex at C4-5 and minimal to mild bilateral foraminal bulging of the C5-6 disc. Mild to slightly more moderate bilateral neural foraminal encroachment at C4-5 due to the disc at this level slightly worse on the left accentuated by mild hypertrophic facet disease.

2. No significant spinal stenosis seen.

3. Mild hypertrophic facet disease at C3-4 and C4-5 present.

4. Intact cervical cord allowing for mild scattered artifact.

(Doc. 6-9, p. 34) (emphasis omitted).

Dr. Walker referred Ms. Elledge to The Orthopaedic Center in January 2018. (Doc. 6-9, pp. 76-77). Ms. Elledge visited Dr. Carter, a physician specializing in physical medicine and rehabilitation. She complained of "diffuse widespread spine pain." (Doc. 6-9, pp. 76, 78, 81). Ms. Elledge described her pain as "all across her neck, shoulder blades, mid-back, low back, with radiation down both legs." (Doc. 6-9, p. 78). Ms. Elledge shared with Dr. Carter that she has been dealing with the pain, "but it has been gradually getting worse." (Doc. 6-9, p. 78). Ms. Elledge reported that "pain medication . . . is the only thing that keeps her functional and not wanting to just sit on the couch." (Doc. 6-9, p. 78).

After reviewing Ms. Elledge's MRI films, Dr. Carter noticed "some degenerative disc space collapse with some mild annular bulge at 5,1 and some mild annular bulge at 4,5" but identified "no critical central or neural foraminal stenosis."

(Doc. 6-9, p. 78). Dr. Carter observed "a small cystic structure" on the left spine at the L1 level but was uncertain about its significance. (Doc. 6-9, p. 78). Dr. Carter's impression of Ms. Elledge's neck x-rays was: "Minimal spondylitic changes at the cervicothoracic junction consistent with age; otherwise no acute findings." (Doc. 6-9, p. 80). Dr. Carter's impression of Ms. Elledge's thoracic spine x-rays was: "Essentially negative . . . some hilar calcification of unclear significance . . . ." (Doc. 6-9, p. 80).

After examining Ms. Elledge, Dr. Carter noted that she appeared "comfortable and not in any acute distress." (Doc. 6-9, p. 79). Ms. Elledge had "a normal, non-antalgic gait," and Dr. Carter did not observe any "shuffling or ataxia." (Doc. 6-9, p. 79). Dr. Carter detected generalized tenderness in Ms. Elledge's cervical and thoracic spine. (Doc. 6-9, p. 79). Ms. Elledge showed a "good range of motion with flexion/extension and rotation" in her cervical spine. (Doc. 6-9, p. 79). Dr. Carter did not detect a "palpable defect" in Ms. Elledge's thoracic spine. (Doc. 6-9, p. 79). Dr. Carter noted "diffuse tenderness across" Ms. Elledge's lumbar spine. (Doc. 6-9, p. 79). The results of a seated straight leg raise, slump, and flexion abduction external rotation tests were negative. (Doc. 6-9, p. 79).[10] Dr. Carter detected "some

_____

[10] "The flexion abduction external rotation (FABER) test is used to evaluate for pathology of the sacroiliac joint. The patient lies supine on the examination table and is asked to place one foot on the opposite knee (placing the hip in flexion abduction external rotation)." https://www.medscape.com/answers/2092651-119404/what-is-the-role-of-patrick-faber-test-in-the-evaluation-of-low-back-pain-lbp (last visited Jan. 15, 2020).

prominence to th[e] SC joint on the right" and some mild tenderness.  (Doc. 6-9, p. 80).

Dr. Carter diagnosed Ms. Elledge with lumbar spondylosis, thoracic myofascial pain, and mild cervicothoracic spondylosis.  (Doc. 6-9, p. 80).[11]  Dr. Carter planned to complete a fibromyalgia workup for Ms. Elledge because her pain pattern, age, and gender were consistent with that diagnosis, and he recommended "an MRI of the cervical and thoracic spine."  (Doc. 6-9, p. 80).  Dr. Carter ordered weekly physical therapy.  (Doc. 6-9, p. 81).[12]  Dr. Carter denied Ms. Elledge's request for a refill of narcotic pain medication consistent with the Pain Society guidelines and Ms. Elledge's "nonspecific spine pain."  (Doc. 6-9, p. 81).  Dr. Carter instructed Ms. Elledge to return after the MRI.  (Doc. 6-9, p. 81).

Dr. Hogan, an agency consultant, reviewed Ms. Elledge's records and provided a physical capacity assessment in late January 2018.  (Doc. 6-4, pp. 13-15). Dr. Hogan determined that Ms. Elledge was able to lift or carry 20 pounds occasionally and 10 pounds frequently.  (Doc. 6-4, p. 13).  Dr. Hogan found that with normal breaks, Ms. Elledge could stand, walk, or sit about six hours in an eight-hour period.  (Doc. 6-4, pp. 13-14).  Dr. Hogan placed no limitations on Ms.

---

[11] "Myofascial pain refers to pain caused by muscular irritation."  https://www.spine-health.com/glossary/myofascial-pain (last visited Jan. 16, 2020).

[12] The Court was unable to locate confirmation in the record that Ms. Elledge attended physical therapy.

Elledge's ability to push or pull. (Doc. 6-4, p. 14). Dr. Hogan restricted Ms. Elledge to occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling and never climbing ladders. (Doc. 6-4, p. 14). Dr. Hogan based her functional report on the November 2017 MRI results, the December 2017 treatment records from Cullman Spine Institute, and Ms. Elledge's reported daily activities. (Doc. 6-4, p. 15).

Ms. Elledge returned to Dr. Carter in early February 2018 to discuss her MRI results. (Doc. 6-9, p. 82). Dr. Carter's impression was: "Mild spondylitic changes most notable at 4,5 and 5,6 . . . no significant or severe neural compression . . . ." (Doc. 6-9, p. 82). Ms. Elledge complained of widespread pain with "intermittent radiating pain in both [her] upper and lower extremities." (Doc. 6-9, p. 82). Dr. Carter described Ms. Elledge's presentation as "mildly hysterical" and her gait as non-antalgic. (Doc. 6-9, p. 82). Dr. Carter explained to Ms. Elledge his impression that she has fibromyalgia rather that a "structural problem with [her] spine." (Doc. 6-9, p. 82). Dr. Carter prescribed Neurontin (one 300 mg capsule nightly) and saw no reason for "more aggressive intervention with [Ms. Elledge's] spine at this point." (Doc. 6-9, p. 83).[13] Dr. Carter planned to refer Ms. Elledge "to an arthritis or

---

[13] Neurontin is "an anticonvulsant . . . [prescribed] to treat neuropathic pain (nerve pain) . . . ." https://www.drugs.com/search.php?searchterm=neurontin (last visited Jan. 21, 2020).

fibromyalgia specialist." (Doc. 6-9, p. 82). Dr. Carter instructed Ms. Elledge to continue with physical therapy and return as needed. (Doc. 6-9, p. 82).

Ms. Elledge visited Dr. Walker in mid-February 2018 and complained of "pain all over." (Doc. 6-10, p. 5). Ms. Elledge reported that only pain medication provided relief. (Doc. 6-10, p. 5). Ms. Elledge was taking Norco (one half to one 5mg/325mg tablet three times daily), meloxicam (7.5 mg tablet once or twice daily), and Robaxin (one 500 mg tablet three times daily). (Doc. 6-10, p. 5).[14] Dr. Walker detected a decreased range of motion in Ms. Elledge's neck with extension and side flexion . . . ." (Doc. 6-10, p. 6). Dr. Walker noted a "prominent R sternoclavicular joint with crepitus" in Ms. Elledge's range of motion and tenderness in Ms. Elledge's mid-back. (Doc. 6-10, p. 6). The results of Ms. Elledge's straight leg raise test were negative. (Doc. 6-10, p. 6). Dr. Walker's diagnosed Ms. Elledge with chronic pain, cervical disc degeneration, and generalized osteoarthritis. (Doc. 6-10, p. 6).

Dr. Walker refilled Ms. Elledge's Norco prescription and prescribed duloxetine (300 mg capsule starting with one weekly and then twice daily). (Doc. 6-10, p. 6).[15] Dr. Walker reported that Ms. Elledge "will need pain clinic" treatment.

---

[14] "Norco 5/325 (hydrocodone acetaminophen and bitartrate) is an opioid analgesic and antitussive (cough suppressant) combined with a fever reducer and pain reliever and used to treat moderate to fairly severe pain." https://www.rxlist.com/norco-5-325-side-effects-drug-center.htm (last visited Jan. 21, 2020).

[15] Duloxetine "is used to treat depression and anxiety. . . . [and] to help relieve nerve pain (peripheral neuropathy) in people with . . . chronic back pain . . . ." https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details (last visited Jan. 14, 2020).

(Doc. 6-10, p. 6). Dr. Walker instructed Ms. Elledge to schedule a thoracic MRI and an EMG and nerve conduction study of her upper extremities. (Doc. 6-10, p. 6).

Dr. Walker completed a functional capacity questionnaire on Ms. Elledge during the February 2018 visit. (Doc. 6-9, pp. 38-41). Dr. Walker listed cervical, thoracic, and lumber pain and arthritis as Ms. Elledge's diagnoses. (Doc. 6-9, p. 38). Dr. Walker described Ms. Elledge's prognosis as "fair" and stated that he expected Ms. Elledge's impairments to last twelve months. (Doc. 6-9, p. 38). Dr. Walker listed Ms. Elledge's symptoms as neck, shoulder, and back pain. (Doc. 6-9, p. 38). Dr. Walker explained that Ms. Elledge's neck sticks when rotating and "has to pop." (Doc. 6-9, p. 38). Dr. Walker described Ms. Elledge's neck and shoulder pain as "episodic" with "hand numbness [and] tingling[.]" (Doc. 6-9, p. 38). Dr. Walker reported tenderness in Ms. Elledge's trapezius and lower cervical spine. (Doc. 6-9, p. 38). Dr. Walker listed physical therapy and exercising as part of Ms. Elledge's pain management. (Doc. 6-9, p. 38).

According to Dr. Walker, Ms. Elledge is not a malingerer. (Doc. 6-9, p. 39). Dr. Walker reported that "emotional factors contribute to the severity of [Ms. Elledge's] symptoms and functional limitations[.]" (Doc. 6-9, p. 39). Dr. Walker noted that Ms. Elledge's depression impacts her physical condition. (Doc. 6-9, p. 39).

Dr. Walker stated that without medication, Ms. Elledge could not walk one city block. (Doc. 6-9, p. 39). Dr. Walker did not give an opinion about how far Ms. Elledge could walk with medication. Dr. Walker reported that Ms. Elledge would need seven to eight rest breaks lasting 20 to 30 minutes "in a competitive work situation" and "a job that permits shifting positions . . . from sitting, standing or walking[.]" (Doc. 6-9, p. 39). According to Dr. Walker, Ms. Elledge could lift and carry ten pounds; look up, twist, bend, crouch and squat, climb ladders and stairs rarely; look down and turn her head occasionally; and hold her head in a static position frequently. (Doc. 6-9, p. 40). Dr. Walker reported that Ms. Elledge had no significant limitations with reaching, handling, or fingering. (Doc. 6-9, p. 40). But Dr. Walker restricted Ms. Elledge's use of her hands to grasp, turn, and twist objects to 50 percent of an eight-hour period. (Doc. 6-9, p. 40). Dr. Walker restricted Ms. Elledge's ability to reach with her arms to one to five percent of an eight-hour time period. (Doc. 6-9, p. 40). Dr. Walker stated that Ms. Elledge would have "'good days'" and "'bad days'" and would be absent from work "[m]ore than four days" monthly. (Doc. 6-9, p. 40).

Ms. Elledge had an MRI of her thoracic spine in February 2018. (Doc. 6-10, p. 8). Dr. Jokich provided the following impressions:

> 1. Minimal degenerative disc disease within thoracic spine with early disc desiccation at many of the mid to lower thoracic disc levels and minimal focal central bulging of the T4-T5 disc which does not cause any

significant neural foraminal encroachment or spinal stenosis.

2. No other significant posterior bulging discs or posterior disc herniations allowing again for chronic Schmorl's nodes at T10-T11, T11-T12, and T12-L1.

3. No spinal stenosis seen.

4. Intact thoracic cord allowing for mild scattered artifact.

5. No compression fracture seen.

(Doc. 6-10, p. 8) (emphasis omitted).

Ms. Elledge returned to Dr. Walker in March 2018 to discuss her MRI results and pain management. (Doc. 6-10, p. 2). Before this visit, Dr. Walker had tried referring Ms. Elledge to Valley Pain Clinic, but the practice did not accept her as a patient. (Doc. 6-10, pp. 11-12). Dr. Walker detected a normal range of motion in Ms. Elledge's neck. (Doc. 6-10, p. 2). Ms. Elledge's diagnoses were consistent with her January visit. (Doc. 6-10, p. 3). Dr. Walker reported that "specialist[s] do not see [a] need for chronic pain . . . medication" and that Ms. Elledge "really needs to pursue other venues for pain management[.]" (Doc. 6-10, p. 3). Dr. Walker noted that Ms. Elledge would "try to taper medication." (Doc. 6-10, p. 3).

In April 2018, Ms. Elledge visited Dr. Cole, a physician with Quality of Life Health Services Inc., complaining of pain. (Doc. 6-9, pp. 42, 49). Ms. Elledge stated that her back trouble began in 2013 and that the source was unrelated to an injury. (Doc. 6-9, pp. 42, 44). Ms. Elledge reported visiting a medical provider for back

pain in November 2017 and having had three MRIs and several x-rays of her back. (Doc. 6-9, p. 44).

Ms. Elledge described her lower back and neck pain as "fluctuating" and "occurring persistently." (Doc. 6-9, p. 42); (*see also* Doc. 6-9, p. 45) (noting positive for back and neck pain as part of a musculoskeletal system review). Ms. Elledge reported having "sharp and shooting" pain that radiates into her feet. (Doc. 6-9, p. 42). According to Ms. Elledge, bending, changing positions, performing daily activities, sitting, standing, twisting, and walking aggravated her pain; medication alleviated it. (Doc. 6-9, p. 42). Ms. Elledge rated her pain nine out of ten. (Doc. 6-9, p. 46). Ms. Elledge reported that she had scheduled "an appointment with [a] pain clinic in May [2018]." (Doc. 6-9, pp. 47, 48).

Ms. Elledge shared that in the two weeks before her visit, she experienced depression, hopelessness, tiredness, and little energy on several days. (Doc. 6-9, p. 43). According to Ms. Elledge, she also had a poor appetite (or overeating) and trouble concentrating. (Doc. 6-9, p. 43). Ms. Elledge reported that none of these problems "made it [difficult] for [her] to . . . work, take care of things at home or get along with other people[.]" (Doc. 6-9, p. 43).

Dr. Cole examined Ms. Elledge's back. (Doc. 6-9, p. 47). Dr. Cole noted tenderness and mild pain with motion in Ms. Elledge's cervical and lumber spine.

(Doc. 6-9, p. 47). Dr. Cole diagnosed Ms. Elledge with chronic low back pain. (Doc. 6-9, pp. 42, 48).

Dr. Cole prescribed methocarbamol (one 500 mg tablet three times daily for muscle spasms), nabumetone (one 500 mg tablet twice daily for back pain), and paroxetine for depression. (Doc. 6-9, p. 45).[16] Ms. Elledge's reported pain medication included Norco 5-325 (three times daily) and nabumetone (one 500 mg tablet twice daily). (Doc. 6-9, p. 45). According to the April 2018 treatment record, Ms. Elledge declined duloxetine, Neurontin, and a Toradol shot. (Doc. 6-9, p. 48). Dr. Cole instructed Ms. Elledge to schedule a follow up visit for May and to seek emergency treatment if her symptoms worsened in the meantime. (Doc. 6-9, p. 48).

Using a referral from Dr. Walker (Doc. 6-10, p. 13), Ms. Elledge visited Tennessee Valley Pain Consultants as a new patient in May 2018 and met with Dr. Gantt and a licensed practical nurse. (Doc. 6-10, pp. 14, 18, 25). Ms. Elledge complained of "aching" neck and low back pain and rated the intensity eight out of ten. (Doc. 6-10, p. 14). According to Ms. Elledge, sitting and bending aggravated her pain; heat and cold alleviated it. (Doc. 6-10, p. 14).

Ms. Elledge reported "diffuse, uncontrollable pain" in her neck, shoulders, mid-back, low back, and lower extremities "that limits her ability to function." (Doc.

---

[16]     Nabumetone     is     the     generic     form     of     Relafen. https://www.drugs.com/search.php?searchterm=nabumetone&a=1 (last visited Jan. 21, 2020).

6-10, p. 18).  Ms. Elledge characterized her pain as worsening and stated that Norco "is the only thing that helps."  (Doc. 6-10, p. 18).  Ms. Elledge believed that her imaging which did not support surgery "was 'Botched'" and shared that she had an "attorney looking over [her] case."  (Doc. 6-10, p. 18).  With respect to her anxiety and depression, Ms. Elledge was "very upset" that she would not be receiving a prescription.  (Doc. 6-10, p. 18).

The TVPC providers described Ms. Elledge's gait as "steady" and "normal[.]" (Doc. 6-10, pp. 15, 22).  They detected no ataxia, range of motion, or strength difficulties.  (Doc. 6-10, p. 22).  The TVPC providers noted tenderness in Ms. Elledge's neck and trunk.  (Doc. 6-10, p. 22).

The TVPC providers diagnosed Ms. Elledge with chronic pain syndrome, cervicalgia, degenerative disc disease, and fibromyalgia.  (Doc. 6-10, pp. 23-24). They instructed Ms. Elledge to continue Dr. Walker's medication regimen "only as prescribed" and her home exercise program.  (Doc. 6-10, p. 24).  The TVPC providers discussed "possible interventional procedures" but noted that Ms. Elledge declined the suggestion citing "financial constraints[.]"  (Doc. 6-10, p. 24).  The TVPC did not prescribe new medication and instructed Ms. Elledge to return in four to eight weeks.  (Doc. 6-10, p. 24).

Later in May 2018, the emergency department of Decatur Morgan Hospital admitted Ms. Elledge for evaluation after she complained of neck and back pain.

(Doc. 6-11, pp. 2, 4, 5).[17]  A certified registered nurse practitioner met with Ms. Elledge.  (Doc. 6-11, p. 9).  Dr. Williams served as Ms. Elledge's supervising emergency physician.  (Doc. 6-11, p. 9).  Ms. Elledge described the pain as chronic and "present for 6 months."  (Doc. 6-11, p. 4).  Ms. Elledge reported having seen multiple doctors but that she still is experiencing pain.  (Doc. 6-11, p. 4).  Ms. Elledge shared that she "is not happy with any of her doctors and that she has an appointment with a new doctor in June and is going to start from scratch."  (Doc. 6-11, pp. 4-5).

Ms. Elledge characterized the severity of her pain as "moderate" and denied any radiating pain.  (Doc. 6-11, p. 5).  Ms. Elledge reported a gradual onset over six months and denied any injury.  (Doc. 6-11, p. 5).  Ms. Elledge described the quality of her pain as "aching" and denied "burning, cramping, dull[ness], fullness, indigestion, pressure, sharp[ness], stabbing, tearing, throbbing, [and] tightness."  (Doc. 6-11, p. 5).  Ms. Elledge stated that her pain is "constant" and denied that it changed over time or was worsening.  (Doc. 6-11, p. 5).

The CRNP examined Ms. Elledge's neck and back and detected no tenderness.  (Doc. 6-11, pp. 6, 7). The CRNP noted that Ms. Elledge had a normal range of motion in her neck and extremities.  (Doc. 6-11, pp. 6, 7).  The CRNP

_____

[17] One page of the emergency treatment notes reflects that Ms. Elledge's complained of leg pain. (Doc. 6-11, p. 2).  Other pages do not.  (*See* Doc. 6-11, p. 4) (listing neck and upper back); (Doc. 6-11, p. 5) (noting neck and back pain and denying any extremity pain).

observed that Ms. Elledge had a normal gait. (Doc. 6-11, p. 7). The CRNP told Ms. Elledge that the specialist "had better diagnostics" available than he did in the emergency department. (Doc. 6-11, p. 7). The CRNP explained that in the absence of "a new injury there wasn't much to be done in the [emergency department]." (Doc. 6-11, p. 7). The CRNP noted that Ms. Elledge "agree[d] with [the] plan and verbalize[d] [her] understanding." (Doc. 6-11, p. 7).

Ms. Elledge returned to Dr. Cole in June 2018 and complained of neck pain from a car accident injury. (Doc. 6-9, p. 50). Ms. Elledge described the pain as constant, fluctuating, aching, and sharp. (Doc. 6-9, p. 50). Ms. Elledge reported that the pain radiates to her shoulder and back. (Doc. 6-9, p. 50). According to Ms. Elledge, movement aggravated her pain, and medication relieved it. (Doc. 6-9, p. 50). Ms. Elledge denied symptoms of bruising, crepitus, decreased mobility, difficulty with sleep, joint instability and tenderness, limping, locking, nocturnal pain, numbness, popping, spasms, swelling, tingling in the arms and legs, and weakness. (Doc. 6-9, pp. 50, 52). Ms. Elledge rated her pain eight of ten. (Doc. 6-9, p. 53). Dr. Cole diagnosed Ms. Elledge with chronic back pain and cervicalgia. (Doc. 6-9, p. 54).[18] Dr. Cole ordered spine x-rays. (Doc. 6-9, p. 54).

---

[18] Cervicalgia "describe[s] pain or significant discomfort in [a person's] neck, especially at the back and/or sides." https://www.verywellhealth.com/cervicalgia-definition-296573 (last visited Jan. 14, 2020).

Ms. Elledge returned to Dr. Cole later in June 2018 to discuss the x-ray results and pain management. (Doc. 6-9, p. 56). Ms. Elledge's description of her pain resembled the earlier June 2018 visit except on this occasion, she reported "no relieving factors." (Doc. 6-9, p. 56). Ms. Elledge rated her pain five out of ten. (Doc. 6-9, p. 56).

Dr. Cole noted weakness in Ms. Elledge's cervical spine, tenderness in her lumbar spine, and mild pain with motion. (Doc. 6-9, p. 56). Dr. Cole explained that Ms. Elledge's x-ray results showed a collapsed disc at L5 but revealed no changes. (Doc. 6-9, pp. 59, 70). Dr. Cole declined Ms. Elledge's request for narcotic pain medication and instructed her to continue taking ibuprofen as prescribed. (Doc. 6-9, p. 59). Dr. Cole discussed referring Ms. Elledge to a neurosurgeon for her neck pain if she quit smoking. (Doc. 6-9, pp. 59, 60). According to the treatment notes, Ms. Elledge wanted a second opinion. (Doc. 6-9, p. 59). Dr. Cole characterized Ms. Elledge's back and neck pain as "[p]oorly controlled." (Doc. 6-9, p. 60).

Ms. Elledge reported that she was not taking methocarbamol or nabumetone but using ibuprofen for pain. (Doc. 6-9, pp. 52, 60). Ms. Elledge received a prescription for ibuprofen (one 800 mg tablet three times daily for back pain) and tizanidine (one 4 mg capsule three times daily for spasms and pain). (Doc. 6-9, pp. 52, 60). Ms. Elledge received patient education about back and neck pain. (Doc. 6-9, p. 60).

Ms. Elledge saw Dr. Cole in July 2018 and complained of aching, sharp, and radiating foot pain and a rash. (Doc. 6-9, pp. 62, 66). Ms. Elledge stated that her foot pain began three months earlier and was unrelated to an injury. (Doc. 6-9, p. 62). According to Ms. Elledge, movement aggravated the pain, and nothing relieved it. (Doc. 6-9, p. 62). Ms. Elledge rated her pain seven out of ten. (Doc. 6-9, p. 66). Dr. Cole ordered x-rays and instructed Ms. Elledge to take ibuprofen for her bilateral foot pain. (Doc. 6-9, p. 66). According to Dr. Cole's treatment notes, Ms. Elledge did not complain of back or neck pain during this visit. Ms. Elledge's medications included ibuprofen for back pain and tizanidine for spasms and pain. (Doc. 6-9, p. 68).

## 2. The ALJ's Assessment of Ms. Elledge's Records

In applying the pain standard, the ALJ found that Ms. Elledge's impairments "could reasonably be expected to cause some of the alleged symptoms" but that Ms. Elledge's "statements concerning the intensity, persistence and limiting effects . . . are not entirely consistent with the medical evidence and other evidence in the record." (Doc. 6-3, p. 15). After summarizing Ms. Elledge's medical records, the ALJ determined that the "evidence simply does not support the allegations of limitation . . . to the extent alleged." (Doc. 6-3, p. 17). The record contains substantial evidence that supports the ALJ's decision to partially credit Ms. Elledge's description of her pain.

The record shows that Ms. Elledge does not have a consistent, long-standing treatment history for back or neck pain. Ms. Elledge visited many different doctors, often seeking pain medication. From November 2017 to June 2018, Ms. Elledge visited Dr. Walker, Dr. Carter, the Cullman Spine Institute, the TVPC, Dr. Cole, and the Morgan County Hospital for back and neck pain. During this eight-month period, Ms. Elledge rated her pain five in December 2017, nine in April 2018, eight in May 2018, eight in June 2018, and five in late June 2018. (Doc. 6-9, pp. 12, 14; Doc. 6-10, p. 14; Doc. 6-9, pp. 53, 56).[19] Ms. Elledge was prescribed different medications by different treating physicians to manage her symptoms, but by the summer of 2018, she was prescribed only ibuprofen for pain and tizanidine for spasms, and doctors urged her to taper her medication. Ms. Elledge refused some proposed treatments. In June 2018, Dr. Cole characterized Ms. Elledge's back and neck pain as "[p]oorly controlled," (Doc. 6-9, p. 60), but that may be because Ms. Elledge did not take her medication as prescribed (Doc. 6-9, p. 58). Ms. Elledge asked Dr. Cole to prescribe narcotic pain medicine. He refused and continued Ms. Elledge on ibuprofen. (Doc. 6-9, p. 60).

---

[19] Ms. Elledge's seven pain rating in July 2018 pertained to her feet. (Doc. 6-9, pp. 62, 66). Even when accepting Ms. Elledge's bilateral foot pain as related to her back and neck pain, the duration of Ms. Elledge's pain treatment is still less than the required 12 months. *See* SSR 82-52, 1982 WL 31376, at *1) ("Severe impairments lasting less than 12 months cannot be combined with successive, unrelated impairments to meet the duration requirement.").

The ALJ observed that "[p]hysical examinations consistently showed normal range of motion, normal gait, negative straight leg raise [tests] and good strength in the upper and lower extremities." (Doc. 6-3, p. 17).  Ms. Elledge's medical records confirm that none of Ms. Elledge's providers observed an abnormal gait.  (*See, e.g.*, Doc. 6-9, p. 20) (normal gait with Dr. Walker in November 2017); (Doc. 6-9, p. 5) (normal gait at Decatur Morgan Hospital in December 2017); (Doc. 6-9, p. 12) (normal gait at Cullman Spine Institute in December 2017); (Doc. 6-9, p. 82) (normal gait with Dr. Carter in January 2018); (Doc. 6-10, pp. 15, 22) (normal gait at TVPC in May 2018); (Doc. 6-11, p. 7) (normal gait at Decatur Morgan Hospital).  No provider reported a positive straight leg raise test or detected poor strength in Ms. Elledge's extremities.  (*See, e.g.*, Doc. 6-9, p. 20) (negative straight leg test with Dr. Walker in November 2017); (Doc. 6-9, pp. 12, 13) (negative straight leg test and full strength in lower extremities at Cullman Spine Institute in December 2017); (Doc. 6-9, p. 79) (negative straight leg test with Dr. Carter in January 2018); (Doc. 6-10, p. 22) (normal strength in upper and lower extremities at TVPC in May 2018).

Ms. Elledge's medical records showed different reports of range of motion. During Ms. Elledge's initial visit with Dr. Walker in November 2017, Dr. Walker observed a "limited active [range of motion] with flexion." (Doc. 6-9, p. 20).  In December 2017, Ms. Elledge had good range of motion in her extremities, (Doc. 6-9, p. 5), but limited range of motion from her fingertips to her knees.  (Doc. 6-9, p.

12). Dr. Carter observed "a good range of motion" in Ms. Elledge's cervical spine in January 2018. (Doc. 6-9, p. 79). Dr. Walker reported a decreased range of motion in Ms. Elledge's neck in February 2018, (Doc. 6-10, p. 6), but a normal range in March 2018, (Doc. 6-10, p. 2). In February 2018, Dr. Walker detected a "prominent R sternoclavicular joint with crepitus" in Ms. Elledge's mid-back range of motion. (Doc. 6-10, p. 6). Dr. Cole noted tenderness and mild pain with motion in Ms. Elledge's cervical and lumber spine in April 2018. (Doc. 6-9, p. 47). In May 2018, the TVPC found no range of motion difficulties. (Doc. 6-10, p. 22). During this same month, Ms. Elledge had a normal range of motion in her neck and extremities at the Decatur Morgan Hospital. (Doc. 6-11, pp. 6, 7). Consequently, substantial evidence does not support the ALJ's finding that Ms. Elledge's range of motion has consistently been normal, but this is the only physical finding by the ALJ that the medical evidence does not fully support.

The ALJ properly considered Ms. Elledge's unwillingness to try a steroid injection as evidence relating to the credibility of her pain testimony. (Doc. 6-3, p. 5). The record shows that the CPRN discussed with Ms. Elledge the potential benefits from a steroid injection and the availability of a payment arrangement plan for the procedure. (Doc. 6-9, p. 13). Still, Ms. Elledge rejected this recommendation and requested a prescription for narcotic pain medication. (Doc. 6-9, p. 13). Ms. Elledge's rejection of a steroid injection in the absence of a prior ineffective result

or an adverse reaction to this procedure is inconsistent with Ms. Elledge's allegations of disabling symptoms.

Substantial evidence supports the ALJ's finding that no specialist recommended back or neck surgery to Ms. Elledge. (Doc. 6-3, p. 16, 17). The CNRP from the Cullman Spine Institute reported that Ms. Elledge will likely need a back fusion in the future but did not recommend surgery in December 2017. (Doc. 6-9, p. 13); (*see also* Doc. 6-9, p. 82) (Dr. Carter saw no reason for "more aggressive intervention with [Ms. Elledge's] spine" in February 2018.).

The record substantiates the ALJ's finding that Ms. Elledge denied symptoms of "crepitus, decreased mobility, difficulty with sleep, joint instability, joint tenderness, limping, locking, nocturnal awakening/pain, numbness, popping, spasms, swelling, and tingling in the extremities" during a follow-up visit with Dr. Cole in June 2018. (Doc. 6-3, p. 16; Doc. 6-9, pp. 50, 52). When Ms. Elledge visited Dr. Cole in July 2018, she complained of "joint tenderness" but denied "bruising, crepitus, decreased mobility, difficulty initiating sleep, joint instability, limping, locking, nocturnal awakening, nocturnal pain, numbness, popping, spasms, swelling, tingling in the arms, tingling in the legs[,] and weakness." (Doc. 6-9, p. 62); (*see also* Doc. 6-9, p. 66).

Thus, the ALJ provided adequate reasons based on objective medical records to discount the full extent of Ms. Elledge's subjective reports of pain. *See Markuske*

*v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 762, 766 (11th Cir. 2014) (A claimant's self-reporting that medication has reduced pain symptoms supports an adverse credibility finding.); *Markuske*, 572 Fed. Appx. at 767 ("The objective medical evidence cited by the ALJ provided 'adequate reasons' for her decision to partially discredit Markuske's subjective complaints" of pain.).

### Daily Activities

The ALJ found that Ms. Elledge's pain testimony was inconsistent with some of Ms. Elledge's daily activities reported in late December 2017. (Doc. 6-3, p. 17); (*see also* Doc. 6-7, pp. 32-37, 39). The ALJ identified Ms. Elledge's ability to "shop[] in stores for necessities/food, prepare meals for her family, do laundry, manage her own personal care, care for [a] pet [dog], run errands, use the computer daily, and attend church . . . occasionally" as activities undermining Ms. Elledge's subjective limitations. (Doc. 6-3, p. 17).

The ALJ may consider a claimant's daily activities when making a credibility finding. *See* 20 C.F.R. § 404.1529(c)(3) (listing "daily activities" as a relevant factor to consider in evaluating a claimant's subjective pain testimony). When examining daily activities, an ALJ must consider the record as a whole. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (faulting the Appeals Council's finding that claimant's "daily activities . . . have not been significantly affected" when the Appeals Council "ignored other evidence that her daily activities have been

significantly affected"). The Eleventh Circuit has recognized that "participation in everyday activities of short duration" will not prevent a claimant from proving disability. *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Instead, "[i]t is the ability to engage in gainful employment that is the key, not whether a Plaintiff can perform chores or drive short distances." *Early v. Astrue*, 481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007); *see Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (claimant who "read[s], watch[es] television, embroider[s], attend[s] church, and drive[s] an automobile short distances . . . . performs housework for herself and her husband, and accomplishes other light duties in the home" still can suffer from a severe impairment).

While an ALJ need not discuss "all portions of the function report," the ALJ must make it clear that she considered the claimant's condition "on the whole." *Miles v. Comm'r, Soc. Sec. Admin.*, 652 Fed. Appx. 923, 927 (11th Cir. 2016); *see also Foote*, 67 F.3d at 1562 (If an ALJ rejects a claimant's subjective complaints, "the reasons should be expressed."); *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (An ALJ's decision must reflect more than a "broad rejection" of a claimant's credibility).

Here, the ALJ did not address several limitations that Ms. Elledge mentioned in her function report. For example, Ms. Elledge reported that she could not walk,

take the dog to the park, or do yard work because of pain. (Doc. 6-7, p. 33).[20]

According to Ms. Elledge, she could do laundry if she "fe[lt] like doing it" and she "need[ed] pain medicine . . . to do stuff." (Doc. 6-7, p. 34). Ms. Elledge acknowledged that she could "do a little housework" but that the activity made her pain worse. (Doc. 6-7, p. 35). But Ms. Elledge confirmed that medication "seem[ed] to be helping [her]," and that with it, she had "a little hope and the huge black cloud [had] lifted . . . ." (Doc. 6-7, p. 37); (*see also* Doc. 6-7, p. 34) (medication helped with some but not all pain). Thus, the omission of these limitations is harmless error because of Ms. Elledge's statements confirming her improved functionality with medication.

### B.    Dr. Walker's Opinion

Ms. Elledge maintains that the ALJ should have accepted the physical capacities opinion of Dr. Walker, one of Ms. Elledge's treating physicians. (Doc. 8, pp. 3-8). "Absent 'good cause,' an ALJ is to give the medical opinions of treating physicians 'substantial or considerable weight.'" *Winschel*, 631 F.3d at 1179 (quoting *Lewis*, 125 F.3d at 1440). When an ALJ does not give a treating physician's opinion considerable weight, an ALJ must clearly articulate the reasons for her decision. *Winschel*, 631 F.3d at 1179. Good cause exists when:

---

[20] In another part of the report, Ms. Elledge stated that she does not know how far she can walk "before needing to stop and rest" because she has not "tried just walking." (Doc. 6-7, p. 37).

> (1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.

*Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004); *Lustgarten v. Comm'r of Soc. Sec.*, No. 17-14763, 2019 WL 6048534, at *2 (11th Cir. Nov. 15, 2019) (quoting *Phillips* for good cause framework).

The ALJ found that the record lacked "significant objective support for Dr. Walker's overly restrictive limitations." (Doc. 6-3, p. 16). The ALJ pointed out that "one month after completing the restrictive assessment, Dr. Walker . . . [noted] that specialists had seen no surgical issues and that he found no indication for [prescribing] chronic pain medication to [Ms. Elledge]." (Doc. 6-3, p. 16). The ALJ found that Ms. Elledge's normal gait, negative straight leg raise tests, and good extremity strength undermined Dr. Walker's opinion. (Doc. 6-3, p. 17). The ALJ determined that Ms. Elledge's daily activities were "more consistent with the limitations offered by Dr. Hogan," a consulting physician. (Doc. 6-3, p. 17).

Before completing the functional assessment, Dr. Walker did not place limitations on Ms. Elledge's ability to sit, stand, walk, or use her upper extremities. Dr. Walker's physical findings, including Ms. Elledge's normal gait and negative straight leg raise test results, are inconsistent with his functional report in which he appears to have fully credited Ms. Elledge's subjective symptoms.

Consequently, the ALJ demonstrated good cause for assigning little weight to Dr. Walker's opinion. *See Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (Good cause includes the absence of "clinical data or information to support [an] opinion" and contradictions within the physician's treatment notes.).

Ms. Elledge maintains that the ALJ improperly substituted her opinion for that of Dr. Walker. (Doc. 8, p. 8); *see Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir. 1986) (reversing because the ALJ substituted his lay opinion about the claimant's gait for the medical evidence showing more than a moderate limitation); *Storey v. Berryhill*, 776 Fed. Appx. 628, 637 (11th Cir. 2019) (citing *Graham* and observing that "it is generally improper for an ALJ to substitute his own judgment for that of a medical expert because ALJs are not medical experts"). But the lay opinion rule does not apply here because the ALJ formulated Ms. Elledge's RFC with the benefit of Dr. Hogan's functional assessment. (Doc. 6-3, p. 16). The ALJ found that Dr. Hogan's opinion was more consistent with the overall record. Reports from other providers that Ms. Elledge had a normal gait, negative straight leg test results, and unrestricted strength in her extremities bolster the ALJ's decision to accept Dr. Hogan's opinion over Dr. Walker's assessment. So does the tapering of Ms. Elledge's pain medication in the summer of 2018. Thus, substantial evidence indicates that the ALJ had good cause to assign little weight to Dr. Walker's treating opinion.

Ms. Elledge points out that if the ALJ had accepted Dr. Walker's opinion instead of Dr. Hogan's assessment, the Commissioner's medical-vocational guidelines "would direct a finding of 'disabled'" because of Ms. Elledge's age, past relevant work, and lack of transferrable skills. (Doc. 8, pp. 8, 9). Consequently, Ms. Elledge argues that to deny benefits, "the ALJ had to find that [Ms. Elledge] was capable of [performing] greater than sedentary work." (Doc. 8, p. 9). Because the ALJ identified good cause for rejecting Dr. Walker's opinion and based Ms. Elledge's RFC on substantial evidence, including Dr. Hogan's less restrictive assessment, remand is not warranted.

Ms. Elledge also argues that the ALJ's hypothetical questions to the vocational expert were inadequate because they did not "comprehensively describe [Ms. Elledge's] impairments . . . ." (Doc. 8, p. 9). But the Court has upheld the ALJ's treatment of Dr. Walker's opinion and her credibility determination. Consequently, the ALJ properly excluded from the hypothetical questions medical findings "properly rejected as unsupported[,]" *Crawford*, 363 F.3d at 1161, and "subjective symptoms that exceed[] the RFC determination." *Carroll v. Soc. Sec. Admin., Comm'r*, 453 Fed. Appx. 889, 894 (11th Cir. 2011) (citing *Crawford*).

## V.    CONCLUSION

For the reasons discussed above, the Court affirms the Commissioner's decision.

**DONE** this 24th day of January, 2020.

                                                       _____

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE